UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JANET and NICHOLAS CRESTA,

          Plaintiff,

                                            C.A. NO. 04-10929-RGS

v.

BLACK & DECKER (U.S.) INC.,

          Defendant.

BLACK & DECKER (U.S.) INC.'S MEMORANDUM IN SUPPORT OF
MOTION FOR PROTECTIVE ORDER AND TO COMPEL RETURN OF
INADVERTENTLY PRODUCED PRIVILEGED MATERIAL

Defendant, Black & Decker (U.S.) Inc. ("Black & Decker") files this Memorandum of Law in Support of its Motion for Protective Order and to Compel Return of Inadvertently Produced Privileged Material, and in support thereof, states as follows.

### I.    INTRODUCTION

In response to a request for production of documents, counsel for Black & Decker, despite their reasonable precautions, inadvertently produced certain privileged documents to counsel for the plaintiff. Upon discovering this error, Black & Decker's counsel immediately informed plaintiff's counsel of the mistake, and requested return of the privileged documents. Plaintiff's counsel has refused to return the documents, taking the position that Black & Decker is not entitled to the return of the documents on the grounds that the privilege has been waived by the admittedly inadvertent production. Plaintiff's counsel has agreed to place the subject documents in a sealed

envelope awaiting the filing and resolution of this motion. As a result, Black & Decker files the present motion seeking return of its privileged documents.

## II.  FACTUAL BACKGROUND

### A.  Request for Documents Relating to Prior Lawsuits

On January 7, 2005, Black & Decker received from the plaintiff a First Request for the Production of Documents. Included among those requests was an inquiry regarding any prior lawsuits against Black & Decker involving allegations of a defect in the solenoid coil of the Black & Decker – manufactured product at issue in this case, a model TRO510 TY1 toaster oven (the "510 Toaster Oven").

As national counsel for Black & Decker, Miles & Stockbridge P.C. took primary responsibility for Black & Decker's response to plaintiff's document requests. As explained in the attached Declaration of Alicia C. Reynolds (a senior associate at Miles & Stockbridge),[1] a search for files relating to any prior lawsuits alleging a defect in the solenoid coil of the 510 Toaster Oven was conducted. (Exh. 1, Reynolds Decl., ¶ 4). As a result of that search, the file of one such prior lawsuit, captioned Hanover Insurance/Richard London v. Black & Decker (U.S.) Inc., (hereinafter the "London file") was located. (Id., ¶ 5).

The London file was a litigation file created and maintained by members of Black & Decker's Product Liability Department. (Id., ¶ 6). The Product Liability Department is part of Black & Decker's in-house legal department and is managed and supervised

---

[1] The Declaration of Alicia C. Reynolds, Esquire of Miles & Stockbridge is attached hereto as Exhibit 1. Citations to that Declaration shall appear herein as "Exh. 1, Reynolds Decl., ¶ ___."

by Black & Decker's Senior Counsel for Product Liability. (Id., ¶ 6). As the <u>London</u> file related to a prior lawsuit against Black & Decker, it not surprisingly contained a significant amount of correspondence among both in-house and outside attorneys, and other case materials prepared in anticipation of litigation. (Id., ¶ 7). Once located among the Product Liability Department's closed files, the <u>London</u> file was then forwarded to Ms. Reynolds for review. (Id., ¶ 5)

**B.    Document Production Procedure Employed by Defense Counsel**

Upon receipt of the <u>London</u> file, Ms. Reynolds then set out to review and prepare the file for production to the plaintiff. (Id., ¶ 8). In so doing, Ms. Reynolds followed an established document review procedure developed by Miles & Stockbridge specifically for Black & Decker cases. (Id., ¶ 11). The procedure is specifically designed to minimize the risk of an inadvertent production by outside counsel. (Id.). As explained in greater detail below, this procedure requires review of each document in the pertinent file by two attorneys – first by an associate, and then by the partner in charge of the case. Although these procedures were followed in this case, a ministerial error in copying at the end of that process unfortunately resulted in the very type of inadvertent disclosure that counsel for Black & Decker sought to avoid.

In accordance with the established document production procedure, Ms. Reynolds followed the following steps:

**Step 1: Copying the Original File**

First, a senior paralegal at Miles & Stockbridge, well versed in the Black & Decker document production procedure, had the entire original <u>London</u> file copied.

(Id., ¶ 8). The paralegal then Bates-stamped each page in the <u>London</u> file, and placed all Bates-stamped pages into a "Redweld" folder. (Id.).

**Step 2: Initial Review by Associate**

Once the original <u>London</u> file was copied and Bates-stamped, its contents were initially reviewed by Ms. Reynolds for privileged materials. (Id., ¶ 9). Ms. Reynolds segregated the responsive documents in the Redweld into one of three specifically labeled and color-coded slip files:

- Production (green label) – for documents to be produced to the plaintiff;

- Privileged (red label) – for documents protected by the attorney-client privilege and/or work product doctrine, which were not to be produced; and

- Redacted (yellow label) – for documents that contained some privileged information, but which were to be produced once the privileged information was redacted.[2]

(Id., ¶ 9). After the responsive documents were appropriately categorized, Ms. Reynolds initialed and dated the Redweld as evidence of her initial review and segregation. (Id., ¶ 11)

**Step 3: Second Review by Partner in Charge**

Following Ms. Reynolds' initial review of the responsive documents, the file was then reviewed a second time by a partner at Miles & Stockbridge, J. Mark Coulson, Esquire. (Id., ¶ 12). Mr. Coulson reviewed the responsive documents to ensure that no

---

[2] Once the documents were segregated, each document in the yellow "Redacted" folder was appropriately redacted, and stapled to an unredacted copy. (Id., ¶ 10). A copy of each redacted document (concealing the privileged information) was then placed in the Production folder so that plaintiff would have access to all non-privileged information contained in each such document. (Id.). The unredacted copy (complete with the privileged information) remained in the yellow "Redacted" folder so as not to be produced to the plaintiff. (Id.).

privileged documents were inadvertently placed in the Production folder. (Id.). Following his review of the file, Mr. Coulson also initialed and dated the Redweld. (Id.).

### Step 4: Final Copying and Occurrence of Ministerial Mistake

Under the document production procedure, the green Production folder *only* was then supposed to be sent to an outside copying service as a prelude to production. (Id., ¶ 13). The senior paralegal at Miles & Stockbridge was put in charge of having the Production folder copied and sent to Black & Decker's local Massachusetts counsel, Scott Tucker, for transmittal to plaintiff's counsel. (Id.).

Unfortunately, in this case, all 3 of the slip file folders (including the Privileged and Redacted folders) were inadvertently sent to an outside service for copying. (Id., ¶ 14). As a result of this ministerial mistake, the outside copy service copied the contents of all three folders – not just the documents designated for Production. (Id.). Although the copy service did not place the copies in duplicate slip files, the front of each separately labeled slip file was photocopied and placed on top of its contents. (Id.). Thus, in the copy sets, the contents of all three folders were combined into one stack – but that stack contained 3 divider pages bearing the words "Production," "Privileged" and "Redacted" on top of each set of corresponding documents. (Id.).

Regrettably, Miles & Stockbridge did not catch this copying error before sending the entire copy set to its local counsel, Mr. Tucker, with instructions to forward the documents to plaintiff's counsel. Mr. Tucker received the copy set of the London file on or about April 22, 2005. Mr. Tucker, relying on the instruction of Miles & Stockbridge,

also did not catch the error and made a copy of the entire <u>London</u> file for production to plaintiff's counsel, Liam J. McCarthy, Esquire, who had the materials picked up on April 26 or 27, 2005.

C.      **Discovery of Mistake and Efforts to Correct it**

On the evening of Sunday, May 1, 2005, Mr. McCarthy faxed a deposition notice to Mr. Tucker's office, relating to the deposition of Richard A. Schafebook, Black & Decker's corporate designee which had been scheduled by agreement for May 4 in Baltimore without a formal notice having been served. . The deposition notice indicated that Mr. McCarthy wished to question Mr. Schafebook about a case identified as "<u>Talbot</u>." Upon review of the notice on May 2, 2005, Black & Decker and its counsel questioned how Mr. McCarthy was aware of the <u>Talbot</u> case, as no information regarding that case was included in any documents produced by Black & Decker. This led Ms. Reynolds to compare her copy of the Production documents folder with the copy provided to Mr. Tucker, at which time she discovered the error. (Exh. 1, Reynolds Decl., ¶ 16).

On May 4, 2005, within two business days of discovering the error, Mr. Tucker advised Mr. McCarthy (who had left Boston to attend the deposition in Baltimore the following day) by telephone voicemail of the inadvertent disclosure of the privileged information. (Exh. 2, Tucker Decl., ¶ 8).[3] Mr. Tucker further informed Mr. McCarthy that he would provide him a list of the documents inadvertently produced, so that

---

[3] The Declaration of Black & Decker local counsel, Scott Tucker of Tucker, Heifetz & Saltzman, LLP, is attached hereto as Exhibit 2. Citations to Mr. Tucker's Declaration shall appear herein as "Exh. 2, Tucker Decl., ¶ ___).

plaintiff's counsel could immediately return those documents (Id.). The following day, on May 5, 2005, prior to the commencement of Mr. Schafebook's deposition, Mr. Tucker hand-delivered a letter to Mr. McCarthy identifying by Bates-number the specific documents inadvertency produced, asking Mr. McCarthy to "return these materials consistent with applicable law." (Exh. 2, Tucker Decl., ¶ 9 and Exhibit A thereto).[4] Upon receipt of that letter, Mr. McCarthy advised Mr. Tucker that he would not return the inadvertently produced documents, stating that based on the research had been able to conduct since receiving the voicemail, he believed Black & Decker's claim that it was entitled to have the documents returned was incorrect. (Exh. 2, Tucker Decl., ¶ 10).[5] Attorney McCarthy did agree, however, temporarily to seal the disputed documents should Black & Decker seek an Order from this Court directing him to return them. (Id.). The present motion follows as a result.

### III.  ARGUMENT

**A.    The Critical Role of the Attorney-Client Privilege and Work Product Doctrine.**

The attorney-client privilege is the oldest privilege for confidential communications known to the common law. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); In re Grand Jury Proceedings Grand Jury No. 97-11-8, 162 F.3d 554, 556 (9th Cir. 1998). It is also "the most sacred of all legally recognized privileges." United States v. Bauer, 132 F.3d 504, 510 (9th Cir. 1997). The attorney-client privilege is critical because is encourages full and frank communication between attorneys and their

---

[4] A copy of Mr. Tucker's May 5, 2005 letter is attached as Exhibit A to Mr. Tucker's Declaration.

[5] In so doing, Mr. McCarthy also disputed that all of the documents identified as privileged were, in fact, privileged. (Exh. 2, Tucker Decl., ¶ 10).

clients. Upjohn, 449 U.S. at 389; In re Keeper of the Records, 348 F.3d 16, 22 (1st Cir. 2003). Such frank communication is necessary for attorneys to provide their clients with sound legal advice. Id. With such advice in tow, clients are better able to conform their conduct to the dictates of the law and to present legitimate claims and defenses in the event of litigation. In re Keeper of the Records, 348 F.3d at 22. As the First Circuit has observed, "[i]n many ways, the attorney-client relationship is the heart of our adversarial system of justice." Whitehouse v. U.S. Dist. Court for Dist. of Rhode Island, 53 F.3d 1349, 1360 (1st Cir. 1995). Indeed, the preservation of the attorney-client privilege "is essential to the just and orderly operation of our legal system." Bauer, 132 F.3d at 510. See also Upjohn, 449 U.S. at 389 (full and frank communication between attorney and client "promote[s] broader public interests in the observance of law and administration of justice.").

Similarly important is the attorney work product doctrine. Developed as a corollary to the attorney-client privilege, the work product doctrine protects the confidentiality of an attorney's work product in servicing the needs of his clients. Initially recognized at common law, the work product doctrine has since become codified in the federal practice by virtue of FED. R. CIV. P. 26(b)(3). Upjohn, 449 U.S. at 398. Underlying this doctrine is the recognition that effective advocacy requires protection of a lawyer's "mental impressions, conclusions, opinions and legal theories" developed during and in anticipation of litigation. As observed by the United States Supreme Court in Hickman v. Taylor, the seminal case on the critical role of the work product doctrine:

> In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel…Were [an attorney's work product] open to opposing counsel on mere demand, much of what is not put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

329 U.S. 495, 510-11 (1947). The work product doctrine has further been expanded to include the work product of those individuals working with a lawyer to assist in the representation of the client in anticipation of litigation. FED. R. CIV. P. 26(b)(3) (definition of work product includes materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)").

**B.  Judicial Reluctance to Find Waiver Based on Inadvertent Disclosure.**

Because of the critical role the attorney-client privilege and work product doctrine play in the administration of justice, a court should be cautious about finding an implied waiver of these privileges. In re Keeper of the Records, 348 F.3d at 23. As this Court has previously recognized, the specter of an inadvertent waiver of the attorney-client privilege threatens the frank communication between attorney and client that is so critical to the effective operation of our legal system. Amgen, Inc. v. Hoeschst Marion Roussel, Inc., 190 F.R.D. 287, 292 (D. Mass. 2000).

On occasion, an attorney may inadvertently produce a document during discovery that is protected by the attorney-client privilege and/or the work product

doctrine. Ideally, counsel will be able to resolve this matter informally. <u>Lazar v. Mauney</u>, 192 F.R.D. 324, 330 (N.D. Ga. 2000) ("At best, these situations are resolved *amicably*, by counsel returning documents which are *obviously privileged and inadvertently produced*. It is *unfortunate* that such could not be the case here and that the [c]ourt was forced to expend a great deal of time on this relatively minor matter.") (quoting <u>United States v. Pepper's Steel & Alloys, Inc.</u>, 742 F.Supp. 641, 643-44 (S.D.Fla.1990) (emphasis in original)). Indeed, the American Bar Association's Standing Committed on Ethics and Professional Responsibility has advised that upon receipt of a privileged document, the receiving attorney should take the following responsible steps: 1) avoid examination of the document once the inadvertence is discovered, 2) notify opposing counsel of the disclosure, and 3) abide by the sending lawyer's instructions on disposing of the document. <u>See</u> Formal Opinion 368, November 10, 1992. This Court has explicitly endorsed these steps. <u>See</u> <u>Milford Power Limited Partnership v. New England Power Co.</u>, 896 F. Supp. 53, 57 (D. Mass. 1995) (attorney who received documents known to be privileged "had an obligation" to return them, as outlined in Formal Opinion 368).[6]

Occasionally, however, an attorney who receives inadvertently produced documents refuses to follow the ABA's advice, claiming instead that the disclosing party has waived the applicable privilege with respect to those documents. In such cases, like here, the disclosing party is forced to seek the assistance of the Court to

---

[6] Although the Massachusetts Bar Association's Committee on Professional Ethics has advised that an attorney who received an inadvertently disclosed privileged communication is not ethically bound to return it, this advice has been criticized by this Court. <u>See</u> <u>Amgen</u>, 190 F.R.D. at 290 n. 2 (commending counsel who received inadvertently disclosed privileged materials for following the American Bar Association's advice, rather than the "widely criticized" advice of the Massachusetts Bar Association).

recover the inadvertently produced documents and for a determination that there was no waiver of the applicable privilege.

When forced to decide whether the inadvertent production of privileged documents constitutes a waiver of the privilege, courts have generally approached the issue in one of three different ways. Some courts follow the rule that inadvertent disclosure never results in a waiver of the attorney-client privilege, because the holder of the privilege did not intend to waive it. Amgen, 190 F.R.D. at 290.[7] This approach has been criticized, however, because it creates no incentive for attorneys to safeguard privileged material if there are no consequences for producing privileged documents. Id. at 292. Alternatively, some courts follow the rule that inadvertent disclosure always results in a waiver. Id. at 290. Under this rule, the adequacy of precautions taken to avoid disclosure is irrelevant. Id. This rule has also been criticized, however, for diminishing the attorney-client relationship because clients will be hesitant fully to inform their attorney with the lingering threat of waiver through inadvertent disclosure. Id. at 292. The third approach, a totality of the circumstances approach, "strikes a balance between these two rigid solutions." Id. at 291-92. Under this approach, courts are to consider various factors (described below) in determining whether an inadvertent disclosure of privileged documents constitutes a waiver of the

---

[7] Indeed, until recently this had been the traditional rule in Massachusetts state courts. See, e.g., Flynn v. Kasmet, Norfolk Civ. No. 92-02875-B, slip op. (Mass. Super. Ct. Aug. 10, 2003) (applying the "never waived" approach over the "always waived" and "totality of the circumstances" approaches)..

privilege. Id. In recent years, this Court has adopted this third "totality" approach.[8] See id. at 292 (applying totality of the circumstances test). See also City of Worcester v. HCA Management Co., 839 F. Supp. 86, 89 (D. Mass. 1993) (same).

With this backdrop, under the law of this District, Black & Decker is entitled to the return of the inadvertently produced privileged documents if it establishes, by a preponderance of the evidence, that these documents are, in fact, subject to the attorney-client privilege and/or the work product doctrine, and that it has not waived the applicable privilege through the inadvertent disclosure to plaintiffs' counsel. See Amgen, Inc. v. Hoechst Mariod Roussel, Inc., 190 F.R.D. 287, 289 (D. Mass. 2000).

C.  **The Inadvertently Produced Documents are Privileged**

Attached as Exhibit 3 to this memorandum is a privilege log produced by Black & Decker's counsel, identifying by Bates number each privileged document inadvertently produced, a description of the document, and the basis of the privilege. Upon review of this log, it is clear that each of these documents is either subject to the attorney-client privilege or is protected from disclosure by operation of the attorney work product doctrine. Under FED. R. CIV. P. 26, plaintiff is not entitled to any privileged matter during discovery. Specifically, this Rule provides that "[p]arties may obtain discovery regarding any matter, *not privileged,* that is relevant to the claim or defense of any party..." FED. R. CIV. P. 26(b)(1) (emphasis added).

---

[8] The Massachusetts Supreme Judicial Court also adopted the middle approach in In re Reorganization of Electric Mutual Liability Ins. Co., Ltd. (Bermuda), 681 N.E.2d 838, 842 (1997) ("Where it can be shown, however, that reasonable precautionary steps were taken, the presumption will be that the disclosure was not voluntary and therefore unlikely that there has been a waiver."). See also Amgen, 190 F.R.D. at 291 n.3 (noting Massachusetts' state courts have adopted the middle approach).

The privileged nature of these materials is not surprising, as the <u>London</u> file is a litigation file, prepared and maintained by Black & Decker's Product Liability Department in anticipation of litigation. Under FED. R. CIV. P. 26, materials "prepared in anticipation of litigation or for trial by or for another party or by or for that party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)" qualify for protection under the work product doctrine. FED. R. CIV. P. 26(b)(3). Furthermore, the <u>London</u> file includes letters between Black & Decker and its counsel discussing matters relating to the lawsuit. The inadvertently produced documents are thus clearly protected under both the attorney-client privilege and the work product doctrine.[9]

**D.  Black & Decker's Inadvertent Disclosure Did Not Waive the Privilege.**

In adopting the "totality of the circumstances" test, this Court considers the following factors in determining whether an inadvertent disclosure of privileged documents constitutes a waiver of the privilege:

1. The reasonableness of the precautions taken to prevent inadvertent disclosure;
2. The amount of time it took the producing party to recognize its error;
3. The scope of the production;
4. The extent of the inadvertent disclosure; and
5. The overriding interest of fairness and justice.

<u>Amgen</u>, 190 F.R.D. at 291-92. A careful examination of these factors reveals that this inadvertent disclosure did not waive Black & Decker's attorney-client privilege or its work product protection.

---

[9] To the extent that this Court wishes to review the specific documents at issue, Black & Decker is prepared to submit them to the Court for an *in camera* review.

### 1. Black & Decker took reasonable precautions to prevent inadvertent disclosure

An examination of the first factor in the "totality of the circumstances" test clearly demonstrates that Black & Decker took significant precautions to prevent inadvertent disclosure. Consistent with counsel's rigid document production procedure, Ms. Reynolds reviewed the responsive documents and segregated them into three specifically labeled folders: Production, Privileged, and Redacted. Following Ms. Reynolds' review, a partner at Miles & Stockbridge, Mr. Coulson, reviewed the documents again to ensure that no privileged documents were inadvertently placed in the Production documents folder. Each attorney initialed and dated the Redweld as evidence of their review.

That Black & Decker's counsel segregated the responsive documents into these categories and labeled accordingly is not without significance. In VLT, Inc. v. Lucent Technologies, Inc., 2003 WL 151399 (D. Mass 2003), during a document production, counsel for the producing party removed eighteen privileged documents from the complete set of responsive documents and placed those documents in a separate, unlabeled Redweld folder (the "Redweld eighteen"). Id. at *3-4. The Redweld eighteen were included in the documents provided to the producing party's trial counsel, who was not made aware of their privileged nature and who disclosed all responsive documents, including the Redweld eighteen, to opposing counsel. Id. When the producing party sought the return of the documents and a determination that no privilege had been waived, the court concluded that the inadvertent disclosure did not

warrant waiver with respect to the Redweld eighteen. Id. at *4. The court further held that for other inadvertently disclosed documents, not segregated with the separate Redweld eighteen, the privilege had been waived. Id. at *3.

Furthermore, all of the documents inadvertently produced by Black & Decker in this case were either explicitly labeled as privileged or clearly identifiable as such. Many of the privileged documents inadvertently produced were specifically labeled "PRIVILEGED & CONFIDENTIAL SUBJECT TO ATTORNEY CLIENT PRIVILEGE AND WORK PRODUCT PROTECTION." Several others were letters between Black & Decker and its attorneys. The unredacted documents inadvertently produced were stapled to redacted versions of those same documents, each of which was stamped with the word "REDACTED" or the words "REDACTED" and "CONFIDENTIAL." Moreover, although the Privileged documents and Redacted documents were not produced to Mr. McCarthy segregated in separately labeled slip files, the front of each labeled slip file (bearing the words "PRIVILEGED" and "REDACTED") was photocopied and preceded each group of documents in the stack produced. Black & Decker's counsel thus took great pains to segregate and explicitly label all privileged documents. See U.S. ex rel. Bagley v. TRW, Inc., 204 F.R.D. 170, 180, (C.D. Cal. 2001) ("The fact that some of the documents were labeled "attorney-client privilege" weighs in defendant's favor as well.").

The significant steps taken by Black & Decker's counsel to avoid this unfortunate mistake demonstrate that this first factor weighs heavily in favor of a finding of no

waiver. Indeed, "carelessness should not be inferred merely because an inadvertent production of privileged documents occurred." U.S. ex rel. Bagley, 204 F.R.D. at 179.

### 2.  Black & Decker Recognized its Own Error Almost Immediately

The second totality factor also weighs heavily in favor of a finding of no waiver. Counsel for Black & Decker notified plaintiff's counsel of the inadvertent disclosure within six business days after the documents were produced, and two days after discovering the inadvertent disclosure on its own. See U.S. ex rel. Bagley, 204 F.R.D. at 180 (second factor weighed against the producing party where the receiving party notified the producing party of the inadvertent disclosure). See also Amgen, 190 F.R.D. at 292 (in finding a waiver of the attorney-client privilege, the court observed that the producing party recognized its error only after being notified of the inadvertent production by the attorney receiving the documents). The entire stack of documents was produced to plaintiff's counsel on or about April 26 or 27, and Black & Decker's, the error was discovered on May 2, 2005 and counsel notified plaintiff's counsel of the error on May 4, 2005. This brief span between the time of the disclosure and the time counsel sought to correct the error is indicative of a significant degree of care, rather than a lack thereof. See U.S. v. Mallinckrodt, Inc., --- F.R.D. ----, 2005 WL 873164, *3 (E.D. Mo. 2005) (where discovery of inadvertent disclosure was made in mid-December and e-mail alerting opposing counsel of error send on January 5, disclosing party acted "promptly" to correct error); Martin v. Valley national Bank of Arizona, 1992 WL 196798, (S.D.N.Y. 1992) (a sixteen-day span between the time a privileged document

was inadvertently produced and when its return was requested was a "negligible span of time"). Indeed, this Court has previously refused to find a waiver where the producing party did not discover an inadvertent disclosure of privileged documents for *several months*. City of Worcester v. HCA Management Co., 839 F. Supp. 86, 89 (D. Mass. 1993) (holding that inadvertent disclosure of privileged documents did not constitute a waiver of the attorney-client privilege, despite producing party not noticing its error for approximately five months). Because Black & Decker's counsel quickly discovered its error and sought the return of the documents approximately six business days after the disclosure, the second "totality" factor weighs heavily in favor of no waiver.

### 3. Few Documents Were Inadvertently Disclosed

With respect to factors three and four, Black & Decker's inadvertent disclosure was relatively small. In response to plaintiff's document requests, Black & Decker produced 594 separately Bates-numbered pages. Of these, 134 privileged and 25 unredacted pages were inadvertently produced. Although not insignificant, this number was not the result of a sloppy document review by Black & Decker's counsel, where several documents "slipped through." To the contrary, Black & Decker's counsel applied the rigid document production procedures specifically designed for Black & Decker's files. This is not a case where the methodology employed left much to chance. See, e.g., VLT, Inc., 2003 WL 151399 at *3 (observing that repeated production of the same privileged documents "left much to chance") (internal quotations omitted). Rather, the entire inadvertent disclosure was the result of a copying error. Had only

the Production documents folder been copied (as called for by the protocol), no privileged documents would have been inadvertently disclosed.

Furthermore, where this court has held inadvertent disclosures to constitute a waiver of the attorney-client privilege, the magnitude of the inadvertent disclosure was considerably larger, or the screening methodology was poor. In Amgen, this Court concluded that an inadvertent disclosure of 3,821 pages of privileged material, which filled approximately one large archive box, was so "substantial" that "little [could] be done to reverse the damage." Amgen, 190 F.R.D. at 289. In sharp contrast, Black & Decker inadvertently produced the contents of only two slip files. See also VLT, Inc., 2003 WL 151399 at *3 (observing that repeated production of the same privileged documents "left much to chance") (internal quotations omitted).

Although the inadvertent disclosure of 134 privileged and 25 unredacted pages is not insignificant, the single error that caused the disclosure was. As a result, the third and fourth "totality" factors also weigh in favor of no waiver.

### 4.   The Overriding Interest of Fairness and Justice

The fifth factor also weighs heavily in Black & Decker's favor. As previously discussed, all of the documents inadvertently produced were either explicitly labeled as privileged or clearly identifiable as such. Furthermore, although the Privileged documents and Redacted documents were not produced to Mr. McCarthy segregated in separately labeled slip files, the front of each labeled slip file (bearing the words "PRIVILEGED" and "REDACTED") was photocopied and preceded each group of documents in the stack produced. See Gomez v. Vernon, 255 F.3d 1118, (9th Cir. 2001)

(observing the confidential status of letters between attorney and client was "facially evident" because the letters were on legal letterhead, and the contents of the letters "remove[d] all doubt"). As a result, there is simply no argument, compelling or otherwise, that it is either fair or just for plaintiff to keep these privileged documents or for the Court to hold that Black & Decker has waived its privilege with respect to these documents. See U.S. ex rel. Bagley, 204 F.R.D. at 182 (observing a party who received inadvertently produced privileged documents had no "inherent 'fairness' interest" in keeping them, particularly where it was clear to the receiving attorney that the documents were privileged).

Moreover, while Mr. McCarthy has not returned the documents, he has agreed to seal them pending resolution of Black & Decker's present motion. As a result, these documents have not been "woven into the fabric of the case" and prohibiting plaintiff from using their contents will work no prejudice. See id., 204 F.R.D. at 182 (noting that where the receiving party immediately segregates and seals the inadvertently produced documents, that weighs against a finding of waiver).

Finally, when considering whether the interests of fairness and justice require dictate a waiver of the attorney-client privilege following an inadvertent disclosure of privileged material, "the importance of the attorney-client privilege should not be ignored." Id., 204 F.R.D. at 181. The attorney-client privilege is "the most sacred of all legally recognized privileges." Bauer, 132 F.3d at 510. Moreover, as the First Circuit has observed, a court should be cautious about finding an implied waiver of the

privilege. In re Keeper of the Records, 348 F.3d at 23. The fifth "totality" factor thus weighs heavily in favor of a finding of no waiver.

### IV.   CONCLUSION

In light of each of these five factors, the totality of the circumstances demand the return of the inadvertently produced documents to Black & Decker and a finding by this Court that the disclosure resulted in no waiver of the applicable privileges. Indeed, under these circumstances, a finding that Black & Decker has waived its privileges would in effect be a tacit rejection of the totality test that this court has applied for years.

**WHEREFORE**, for all the foregoing reasons, defendant, Black & Decker (U.S.) Inc. respectfully requests that this Court issue an Order compelling plaintiff's counsel to return all inadvertently produced documents, and holding that Black & Decker did not waive its attorney-client privilege and/or work product doctrine protection with respect to these documents.

Respectfully submitted,

*[signature]*

Scott J. Tucker – BBO#503940
Tucker, Heifetz & Saltzman, LLP
Three School Street
Boston, Massachusetts 02108
(617) 557-9696

Attorney for Defendant,
Black & Decker (U.S.) Inc.

*[Certificate of service stamp, signed Scott J. Tucker 5-17-05]*